# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SHOTSPOTTER INC., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | C.A. No. N21C-10-082 SKR |
| | ) | |
| VICE MEDIA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**Submitted**: **March 11, 2022**

**Decided: June 30, 2022**

*Upon Defendant VICE Media LLC's Motion to Dismiss Complaint*

## GRANTED

## MEMORANDUM OPINION

Brian E. Farnan, Esquire, and Michael J. Farnan, Esquire, Farnan LLP, & Thomas A. Clare, P.C. (admitted *Pro Hac Vice*), Megan L. Meier, Esquire, (admitted *Pro Hac Vice*) & Amy M. Roller, Esquire, (admitted *Pro Hac Vice*) Clare Locke LLP, *Attorneys for Plaintiff ShotSpotter.*

Thomas E. Hanson, Jr., Esquire, Barnes & Thornburg LLP and Rachel Strom, Esquire, (admitted *Pro Hac Vice*), Jeremy Chase, Esquire, (admitted *Pro Hac Vice*), & Nimra H. Azmi, Esquire, (admitted *Pro Hac Vice*) Davis Wright Tremaine LLP, *Attorneys for Defendant Vice Media.*

# I. INTRODUCTION

This defamation action arises from a news story published online by VICE Media, LLC ("Defendant" or "VICE"). ShotSpotter Inc. ("Plaintiff" or "ShotSpotter") is a company that partners with law enforcement agencies nationwide to implement its "network of gunfire-detecting acoustic sensors" to monitor and notify police of purported gunshots and enable faster responses.[1] On July 26, 2021, VICE published an article titled *Police Are Telling ShotSpotter to Alter Evidence from Gunshot-Detecting AI* (the "Article"). The Article details how ShotSpotter has exhibited a "pattern" of "altering" gunshot alerts at the request of police departments. It labels ShotSpotter data as "untested evidence" and states that prosecutors have been "forced to withdraw" ShotSpotter evidence during trial. The Article relies on a number of court filings, primarily from three cases: *U.S. v. Godinez*[2], *People v. Simmons*[3], and *Illinois v. Williams*[4]. Also, on July 26, 2021, Motherboard[5] Editor-in-Chief Jason Koebler posted three promotional tweets about

---

[1] "When a loud, impulsive sound is detected by ShotSpotter's sensors, ShotSpotter's software automatically prescreens the sound and filters out noises likely to be fireworks and helicopters. The remainder are sent to a team of human reviewers that playback audio clips and analyze them to determine if the sound is gunfire. Based on the speed of sound and the times at which the sound reaches different sensors, ShotSpotter's software determines the approximate location of the gunfire, and ShotSpotter notifies law enforcement of the longitude and latitude of the gunfire and a corresponding street address – all typically within 45-60 seconds." *See* Compl at ¶ 9.

[2] *U.S. v. Godinez*, 2019 WL 4857745 (N.D. Ill. Oct. 2, 2019), aff'd, 7 F.4th 628 (7th Cir. 2021). The defendant was charged with shooting a federal agent. The ShotSpotter evidence originally located a couple shots, but after conferring with Chicago police, found five additional gunshots.

[3] *People v. Simmons*, 71 N.Y.S. 3d 924 (N.Y. Sup. Ct. Monroe Cty. 2018); *Simmons v. Ferrigno, et al*. No. 17-CV-6176 (W.D.N.Y. 2018). The defendant was charged with shooting at police officers in Rochester, New York. He was ultimately found not guilty of attempted murder.

[4] *Illinois v. Williams*, No. 20 CR 0899601 (Ill. Cir. Ct. Cook Cty. 2021). The defendant was charged with murder. The parties disputed ShotSpotter's determination of a gunshot location; the ShotSpotter real-time alert geolocation was "a mile away from the site where prosecutors say Williams committed the murder." *See* the Article.

[5] Motherboard is VICE's Tech and Science publication.

the Article to his Twitter account @Jason_Koebler.[6] On July 29, 2021, VICE's CYBER podcast released an episode focusing on the Article.

On October 11, 2021, Plaintiff filed a Complaint against Defendant alleging defamation *per se* and defamation by implication based on the Article, in addition to the tweets and podcast. In the Complaint, Plaintiff seeks $50 million in general damages, $50 million for future lost profits, $100 million for lost enterprise value, $100,000 for expenses incurred for combatting a disinformation campaign, and $100 million for punitive damages.

On December 10, 2021, Defendant filed this Motion to Dismiss (the "Motion"), alleging that its reporting is protected and non-actionable. In addition to this Motion, Defendant filed a Request for Judicial Notice of a number of records, including the Article, accompanying tweets and a podcast, other articles about Plaintiff, and court documents involving Plaintiff. On January 21, 2022, Plaintiff filed an Opposition to Defendant's Motion and an Opposition to Defendant's Request for Judicial Notice. The Court heard oral arguments on the Motion on March 11, 2022.

## II. STANDARD OF REVIEW

When judging a motion to dismiss a complaint for failure to state a claim, made pursuant to Superior Court Civil Rule 12(b)(6), all well-pleaded allegations must be accepted as true.[7] Delaware is a notice pleading jurisdiction.[8] Thus, for a complaint to survive a motion to dismiss, it need only give "general notice of the claim asserted."[9] The test for sufficiency is a broad one, that is, whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of

---

[6] Defendant asserts that the tweets have since been deleted.
[7] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978).
[8] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).
[9] *Id.*

proof under the complaint.[10] If the plaintiff may recover, the motion must be denied.[11] In ruling on a motion to dismiss under Rule 12(b)(6), a trial court must draw all reasonable factual inferences in favor of the party opposing the motion.[12]

Conversely, a Court may grant a motion to dismiss for failure to state a claim if a complaint fails to assert sufficient facts that, if proven, would entitle the plaintiff to relief, i.e. if it fails to plead its claim with "reasonable 'conceivability.'"[13] The court need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[14]

### III. THE STATEMENTS

Plaintiff argues that Defendant launched a "defamatory campaign" on July 26, 2021, by publishing the Article, in addition to tweets and a podcast promoting the Article. Plaintiff alleges that the campaign "falsely accused [Plaintiff] of conspiring with police to fabricate and alter evidence to frame Black men for crimes they did not commit."[15] Specifically, Plaintiff labels fifteen (15) statements as defamatory: eleven (11) defamatory statements from the Article, three (3) tweets from Koebler, and one (1) defamatory statement from the VICE "CYBER" podcast (the "Statements"):

**Statement 1** – Headline of the Article*: "Police Are Telling ShotSpotter to Alter Evidence from Gunshot-Detecting AI."*

**Statement 2** – *"Prosecutors in Chicago are being forced to withdraw evidence generated by the technology. . ."*

---

[10] *Spence v. Funk,* 396 A.2d 967, 968 (Del. 1978).
[11] *Id.*
[12] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).
[13] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 n.13 (Del. 2011).
[14] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011).
[15] Compl. ¶ 32.

4

**Statement 3 –** "*Motherboard's review of court documents from the Williams case and other trials in Chicago and New York State, including testimony from ShotSpotter's favored expert witness, suggests that the company's analysts frequently modify alerts at the request of police departments – some of which appear to be grasping for evidence that supports their narrative of events.*"

**Statement 4 –** Section heading: "*A pattern of alterations.*"

**Statement 5 –** "*Greene . . . was involved in another altered report in Chicago, in 2018[.]*"

**Statement 6 –** "*Initially, the company's sensors didn't detect any gunshots, and the algorithms ruled that the sounds came from helicopter rotors.*"

**Statement 7** – Claims that Chicago prosecutors withdrew the evidence rather than face a *Frye* hearing and that "*[t]he case isn't an anomaly, and the pattern it represents could have huge ramifications for ShotSpotter in Chicago, where the technology generates an average of 21,000 alerts each year. The technology is also currently in use in more than 100 cities.*" " 'The reliability of [ShotSpotter] technology has never been challenged in court and nobody is doing anything about it' . . . 'Chicago is paying millions of dollars for their technology and then, in a way, preventing anybody from challenging it.'*"

**Statement 8** – Section heading: "*Untested evidence.*"

**Statement 9** – "*If a court ever agrees to examine the forensic viability of ShotSpotter, or if prosecutors continue to drop the evidence when challenged, it could have massive ramifications.*"

**Statement 10** – "*[T]he ShotSpotter audio files that were the only evidence of the phantom fifth shot have disappeared*" in the *Simmons* case.

**Statement 11 --** In *Williams*, "*after the 11:46 p.m. alert came in, a ShotSpotter analyst manually overrode the algorithms and 'reclassified' the sound as a gunshot. Then, months later and after 'post-processing,' another ShotSpotter*

*analyst changed the alert's coordinates to a location on South Stony Island Drive near where Williams' car was seen on camera."*

**Statement 12** – *"SCOOP: Police all over America are regularly asking Shotspotter, the AI-powered microphones that 'detect gunshots' to fabricate gunshots from thin air for court proceedings, according to court records we obtained. This is horrifying and nuts"*

**Statement 13** – *"ShotSpotter employee testified in court that police ask them to invent gunshots where they did not exist 'on a semi-regular basis"*

**Statement 14** – *"This fabricated Shotspotter evidence was the only evidence against the man. He was exonerated and Shotspotter and the Rochester police mysteriously deleted all audio recorded. Blatant corruption."*

**Statement 15** -- Excerpt from July 29, 2021 CYBER podcast episode between VICE employees Ben Makuch and Lorenzo Franceschi-Bicchierai.[16]

### IV. THE PARTIES' ARGUMENTS

Defendant moves to dismiss this Complaint, arguing that the defamation claim fails because (1) the California Section 47(d) fair report privilege shields all of the Statements, and that alternatively, (2) none of the Statements are false statements of fact; eleven Statements are substantially true and eleven are protected opinion.[17] In addition, Defendant asserts that Plaintiff failed to assert malice.

Defendant also argues that the defamation by implication claim fails because it is unreasonable and there is no intention alleged.

---

[16] *See* Compl. at 31-33. The exchange focuses on the fact that prosecutors "dropped the [ShotSpotter] evidence" in the *Williams* case, and that "someone had accessed the ShotSpotter data and altered it so that something that had been registered as a firework in the database was then called a gunshot later[.]"

[17] Defendant argues that the Complaint and Public Records demonstrate the truth of Statements 1-9, 11, and 15. Defendant also argues that Statements 2-4, 7-10, and 12-15 are Protected Opinion.

Plaintiff retorts that (1) the California fair privilege does not apply because the reporting was neither an "accurate" nor "fair" report of judicial proceedings, there was improper attribution, and tweets are ineligible for the fair report privilege; and (2) the Statements were false assertions of fact, including improper allegations of evidence tampering, evidence failing to survive judicial scrutiny, and the method in which ShotSpotter measured its gunshot accuracy rates. As for malice, Plaintiff contends that a totality of circumstances shows that Defendant intentionally misrepresented these Statements because ultimately, Defendant wanted to serve its "subversive" brand.

Separately, Plaintiff argues that a defamation by implication claim is warranted because the misuse of records suggests that Defendant intended the defamatory inference that "ShotSpotter had fabricated gunshots out of thin air to frame Black men."[18]

## V. ANALYSIS

### A. The Court recognizes certain exhibits as part of the Complaint, and takes Judicial Notice of others.

Before addressing the arguments for defamation, the Court must determine its scope of review in considering these issues. Defendant requests that the Court take judicial notice of twenty different exhibits because they are "essential to consider the challenged statements in the context of the publications as a whole, and, as such, must be part of the record for this dismissal motion."[19] Plaintiff opposes this Motion, asserting that "[m]atters extrinsic to a complaint generally may not be considered in a ruling on a motion to dismiss" under Rule 12(b)(6).[20]

---

[18] Pl.'s Opp. Br. at 24.
[19] Def.'s Mot. for Judicial Notice at 8.
[20] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).

There are three instances where a trial court can look beyond a complaint on a motion to dismiss: (1) when a document is integral to a claim and incorporated into a complaint; (2) when the document is not being relied upon to prove the truth of its contents; or (3) when the document is an adjudicative fact subject to judicial notice.[21]

Here, a number of the exhibits of which Defendant requests the Court to take judicial notice are already incorporated into the Complaint. For example, Defendant moves the Court to take judicial notice of the Article, Jason Koebler tweets, and a transcript of the podcast conversation. However, all three are integrated into the Complaint. The podcast transcript is embedded in the text of the Complaint[22], and the Article and Koebler tweets are attached exhibits.

Further, a number of these exhibits are integrated by way of the Article. Many of these documents are hyperlinked within the Article.[23] This includes three specific court documents: a Motion to Exclude ShotSpotter evidence in *Illinois v. Williams*[24], the *Simmons v. Ferrigno* Complaint in which ShotSpotter was a Defendant[25], and a transcript of testimony from a ShotSpotter employee in *United States v. Godinez*.[26] The Article also links to a number of other documents and news stories.[27] Thus, a number of these Exhibits are attached to the Complaint and

---

[21] *Bredberg v. Bos. Sci. Corp.*, 2021 WL 2816897, at *3 (Del. Super. July 2, 2021).

[22] Compl. at 31-33.

[23] *Adelson v. Harris*, 402 P.3d 665, 669-670 (Nev. 2017).

[24] *See* Defendant's Ex. 8. *Illinois v. Williams*, No. 20 CR 0899601 (Ill. Cir. Ct. Cook Cty. 2021), Defendant's *Frye* Motion.

[25] *See* Defendant's Ex. 6. *Simmons v. Ferrigno, et al*. No. 17-CV-6176 (W.D.N.Y. 2018)

[26] *See* Defendant's Ex. 9. *United States v. Godinez*, No.18-CR-278 (N.D. Ill. 2019), Paul Greene Testimony.

[27] This includes (1) a news story from *the Democrat and Chronicle* about *New York v. Simmons*, in which a New York county court judge overturned a criminal conviction of the defendant based, in part, on ShotSpotter's evidence being unreliable, (2) a ShotSpotter press release, (3) a *San Francisco Examiner* news story about ShotSpotter's guarantee of accuracy actually deriving from its marketing department, (4) a MacArthur Justice Center press release, and a (5) a *Times Union* news story about a local New York police force deciding not to use ShotSpotter,

subject to judicial review. Hence, they can be properly considered on a motion to dismiss, without the Court needing to take judicial notice.[28]

A court may take judicial notice of a fact if that fact is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonable be questioned."[29] The doctrine should be used with caution; if there is any doubt as to the fact itself or as to it being a matter of common knowledge, then evidence should be required.[30] Delaware courts have previously taken judicial notice of public records in a motion to dismiss context.[31]

It is the Court's job to determine if statements are defamatory or not based on their words and context. In order to determine whether the Statements in this case are defamatory, the Court must be able to review the same court documents that were the basis of these Statements. Here, certain Statements require proper context by way of documents and are not expressly integrated or hyperlinked in the Complaint and Article.

For example, Statement 3 from the Article reads: "Motherboard's review of court documents from the Williams case and other trials in Chicago and New York State, including testimony from ShotSpotter's favored expert witness . . ." The Court is unable to determine if this Statement is defamatory without being able to review the same court documents that Motherboard reviewed. Thus, the Court finds it necessary to review court documents of testimony from "favored expert

Defendant's Ex. 5. *People v. Simmons*, 71 N.Y.S. 3d 924 (N.Y. Sup. Ct. Monroe Cty., 2018).

[28] Thus, the Court shall consider Defendant Exhibits 2, 3, 4, 6, 8, 9, 12, 14, 15, 16, 17, and 18 in its review of the Motion.

[29] *Fawcett v. State*, 697 A.2d 385, 388 (Del. 1997).

[30] *Id.*

[31] *Page v. Oath Inc.*, 2021 WL 528472 (Del. Super. Feb. 11, 2021) (citing *Judy v. Preferred Communication Systems, Inc.,* 2016 WL 4992687 (Del. Ch. Sept.19, 2016)).

witness" Paul Greene. In addition, the Article mentions that Silvon Simmons' conviction was overturned, and hyperlinks to a news story about it, but does not include the court opinion itself. The Court finds it necessary to review this opinion to determine whether certain Statements, including Statement 10, are defamatory. Therefore, the Court, in its consideration of the Motion to Dismiss, will look beyond the Complaint and consider these additional public records, without converting the Motion into a Motion for Summary Judgment.[32] Importantly, the Court is taking judicial notice of the contents of these documents to consider what is contained therein as opposed to the accuracy of the facts in the documents. This is necessary and proper to be able to assess the challenged Statements' alleged defamatory meaning and Defendant's other libel defenses.[33]

### B. Defamation under Delaware law

To state a claim for defamation under Delaware law, the plaintiff must plead and ultimately prove that: 1) the defendant made a defamatory statement; 2) concerning the plaintiff; 3) the statement was published; and 4) a third party would understand the character of the communication as defamatory.[34] If the plaintiff is a public figure, even for a limited purpose, the public figure plaintiff

---

[32] This includes Defendant's Exhibits 5, 7, and 10. Conversely, the Court denies Defendant's Request for Judicial Notice for Exhibits 13, 19, 20, and 21. Defendant sought to include as part of its request for judicial notice (1) other media outlets' stories to show that other outlets made similar statements about ShotSpotter and (2) a Chicago Inspector General report that made similar findings to a MacArthur Justice Center press release used in the Article. The Court finds these documents to be outside the "universe of facts that the trial court may consider . . ." See *In re Gen. Motors S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

[33] Plaintiff argues that Defendant has submitted incomplete exhibits. The Court has reviewed and considered complete versions of Exhibits 7-10, and 14, as submitted by Plaintiff. The Court was not provided with the complete version of Exhibit 11 and is unable to consider the Greene statement in its full context. Hence, out of an abundance of caution, the Court will not take judicial notice of that Exhibit and will not review it in its consideration of the Motion.

[34] *Page v. Oath Inc.*, 2022 WL 164008 at *6, (Del. Jan. 19, 2022) (TABLE). In this case, Defendant does not dispute prongs two or three. The Article was published online, and it concerns Plaintiff.

10

must also plead and prove that 5) the statement is false and 6) that the defendant made the statement with actual malice.[35]

Whether or not a statement is defamatory is a question of law.[36] In answering this question, Delaware courts must determine: "first, whether [the] alleged defamatory statements are expressions of fact or protected expressions of opinion; and [second], whether the challenged statements are capable of a defamatory meaning."[37] Because this question is one of law, a judge can just as easily make the determination under a summary judgment standard as under a motion to dismiss standard.[38] The judge will have before him the allegedly defamatory statements and can determine whether they are defamatory based on the words and the context in which they were published.[39]

Early dismissal of defamation lawsuits for failure of the complaint to state a claim on which relief can be granted "not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive."[40]

Justice Kavanaugh, while on the DC Circuit Court, wrote of the unique positioning of defamation claims:

> The First Amendment guarantees freedom of
> speech and freedom of the press. Costly and time-
> consuming defamation litigation can threaten those
> essential freedoms. To preserve First Amendment

---

[35] *Id.*
[36] *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005).
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Owens v. Lead Stories, LLC*, 2021 WL 3076686 at *9, (Del. Super. July 20, 2021), aff'd, 253, 2021, 2022 WL 521388 (Del. Feb. 22, 2022) (TABLE).

freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits.[41]

In just the past year, Delaware courts have reviewed three defamation claims asserted against the free press: (1) *Owens v. Lead Stories, LLC*, (2) *US Dominion v. Fox News*, and (3) *Carter v. Page.* These cases demonstrate the high bar that must be cleared for a court to grant dismissal.

On July 20, 2021, the Delaware Superior Court dismissed the claim in *Owens v. Lead Stories, LLC*, pursuant to Delaware Superior Court Civil Rule 12(b)(6).[42] Conservative media personality Candace Owens alleged that she was defamed by Lead Stories LLC, after Lead Stories issued a fact-checking response to Owens' claims about the COVID-19 vaccine on Facebook, labeling her comments as a "Hoax Alert". Lead Stories contracted with Facebook to transmit fact-checking stories to the social media page; Facebook then had the option to label users' posts with these stories to determine veracity. Owens' posts had questioned the United States' method for counting COVID-19 related deaths.

The Court found that Owens failed to show that Lead Stories' statements were false under the reasonable conceivability standard. The Court explained that the use of a "Hoax Alert" was "loose, figurative, or hyperbolic language[]" and further, that "[i]t is not reasonably conceivable that readers who read the Lead Stories' Article would have understood 'Hoax Alert' to mean that Plaintiffs were

---

[41] *Kahl v. Bureau of Natl. Affairs, Inc.,* 856 F.3d 106, 109 (D.C. Cir. 2017) (Citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)).
[42] *Owens v. Lead Stories, LLC*, 2021 WL 3076686 (Del. Super. July 20, 2021).

intentionally spreading a lie. Instead, the readers would have understood [it] as a rhetorical hyperbole implying that the Owens' Post carries inaccurate information and that the readers should proceed cautiously when reading the post."[43] Hence, this language was not seen as a basis for liability in Owens' defamation action. On February 22, 2022, the Delaware Supreme Court affirmed the Superior Court's ruling for the reasons stated in the opinion.[44]

On December 16, 2021, the Delaware Superior Court denied a Motion to Dismiss in *US Dominion v. Fox News*. Plaintiff, US Dominion, alleged that Fox News had defamed the company and its voting systems in its coverage of the 2020 U.S. Presidential Election. Fox News subsequently moved to dismiss.

The Court ruled that it was reasonably conceivable that Fox News' reporting was inaccurate in relation to election fraud allegations. Fox News asserted a fair report privilege, similar to VICE's claim here. But the Court found that there was ambiguity from the viewer's perspective, as to whether Fox News was reporting on legal proceedings, and at times, Fox News statements "evince[d] a substantial deviation from those proceedings' alleged facts."[45]

Of note, the Court also held that Dominion adequately alleged malice: "[T]he Complaint alleges facts that Fox News made the challenged statements with knowledge of their falsity or with reckless disregard of their truth."[46] The Court noted that Fox News possessed "countervailing evidence" of election fraud from the Department of Justice, election experts, and Dominion at the time it had been making statements. Further, other Fox News reporters "openly disclaimed the

---

[43] *Id.* at *15.
[44] *Owens v. Lead Stories, LLC*, 273 A.3d 275 at *1, (Del. 2022).
[45] *US Dominion, Inc. v. Fox News Network, LLC*, 2021 WL 5984265 at *26, (Del. Super. Dec. 16, 2021). The Court also found that Fox's other defenses, that the reporting was neutral and opinion-based, did not support dismissal. These findings were determined pursuant to New York law.
[46] *Id.* at *28.

13

fraud claims as false" while some continued to push them. "The nearby presence of dissenting colleagues thus further suggests Fox [News] . . . was knowing or reckless in reporting the claims."[47]

On January 19, 2022, the Delaware Supreme Court affirmed the Superior Court's ruling to dismiss a defamation case filed by Carter Page. Mr. Page, "a public figure with ties to President Trump's 2016 campaign", filed a defamation claim against Oath Inc., the parent company to the Huffington Post and Yahoo News! Page alleged that the media outlets published a number of defamatory articles about him, in regard to a dossier written by Chris Steele, which included information that Page met with senior Russian officials and discussed potential benefits to Russia if Donald Trump were to win the 2016 Presidential Election.

The Delaware Supreme Court found that the articles were, at a minimum, substantially true. Page had alleged that the article improperly repeated allegations from the report that he had met with high-ranking Russian individuals. He also disputed the articles' labeling of Steele as a "well-placed Western intelligence source," and description of Steele's dossier as an "intelligence report." Page alleged that these descriptions conveyed the sense that the reports were from a high level government employee rather than just an intelligence source. Page alleged that viewed in totality, the articles conveyed a false gist that Page colluded with Russian officials, something that he categorically denies.

In determining whether the statements were substantially true, the Court looked at whether the "gist" or "sting" of the statement was true.[48] In its analysis, the Court compared "the effect of the alleged libel versus the effect of the precise

---

[47] *Id.* at *28.
[48] *Page v. Oath Inc.*, 270 A.3d 833, 844 (Del. 2022).

truth on the mind of the recipient or average reader[,] [to] see if the effect is the same."[49]

Ultimately, the Court found that the gist of the article was true: "there was a serious federal investigation" into Page and the Steele Dossier. The articles make clear that these allegations were unsubstantiated and under investigation, using phrases such as "seeking to determine" and "at their alleged meeting[.]" Further, the Court held that the labeling of Steele and the report in the articles were not misleading; Steele was a former MI16 intelligence operative and the report was in fact an intelligence report, albeit not from a U.S. intelligence agency.[50] These cases demonstrate that in Delaware, there is a high bar to clear to establish defamation against a public figure or entity. Clearing that hurdle is contingent on a "gist" or "sting" of the challenged statements being false, and a showing of malice, based on the defendant's sufficient knowledge of the falsity of the statements or reckless disregard of the truth.

### C. The Court must also consider California Civil Code § 47(d).

In addition to Delaware law, the Court must also review the Statements pursuant to California Civil Code § 47(d).[51] The statute mandates that the following are privileged: a fair and true report in, or a communication to, a public journal, of a judicial, legislative, or other public official proceeding, or of anything said in the course thereof, or of a verified charge or complaint made by any person

---

[49] *Id.* (Quoting *Ramada Inns, Inc*., 543 A.2d at 317 (citation omitted))

[50] *Id.* at 848. ("[A]dding 'intelligence' to 'report' is a description of the type of report, not a determination of its origin.")

[51] Defendant states that California law governs as Plaintiff's home state, headquarters, and principal place of business. *See Perlman v. Vox Media, Inc*., 2020 WL 3474143, at *3 (Del. Super. June 24, 2020). Defendant also posits that Plaintiff "already effectively conceded California law applies" because it sent a retraction letter citing California law. Plaintiff makes no counter-argument, and also cites to California law in its arguments.

to a public official, upon which complaint a warrant has been issued.[52] The fair report privilege is "applied broadly[.]"[53]

Like Delaware, California courts have determined that the media's responsibility is to ensure that the gist or sting is accurately conveyed. "Moreover, this responsibility carries with it a certain amount of literary license. The reporter is not bound by the straitjacket of the testifier's exact words; a degree of flexibility is tolerated in deciding what is a 'fair report.'"[54]

"Fair and true" does not refer to the truth or accuracy of the matters asserted in judicial proceedings, "but rather to the accuracy of the challenge[d] statements with respect to what occurred in the judicial proceedings."[55] This accuracy is measured by the natural and probable effect the statements would have on the average reader.[56] Thus, the Court must analyze whether the statements made truly "convey the substance" of what was alleged in the referenced judicial proceedings.[57]

**D. Plaintiff has not sufficiently pled that the Article is defamatory.**

The Court must determine whether these fifteen Statements (1) are expressions of fact or protected expressions of opinion and (2) whether the challenged Statements are capable of a defamatory meaning.[58] This determination is based on the words and context in which the Statements were published. After careful review of the Statements in connection with court documents integrated into the Article, the Court finds that the Statements in question are not defamatory.

---

[52] Cal. Civ. Code § 47
[53] *Sipple v. Found. For Nat'l Progress*, 71 Cal. App. 4th 226, 240 (1999).
[54] *McClatchy v. Superior Court*, 189 Cal. App. 3d 961, 976-977 (1987).
[55] *Healthsmart P., Inc. v. Kabateck*, 212 Cal. Rptr. 3d 589, 603 (Cal. App. 2d Dist. 2016).
[56] *Dorsey v. National Enquirer, Inc.*, 973 F.2d 1431, 1436 (9th Cir. 1992).
[57] *Id.*
[58] *Doe v. Cahill*, 884 A.2d 451, 463 (Del. 2005).

16

### i. Statements about Altering Data

Plaintiff claims that the grouping of Statements 1, 3, 4 and 5 is defamatory because they label ShotSpotter data as being "altered" or "modified" in connection with the police. Defendant contends that these Statements are true because ShotSpotter "regularly alters alerts."[59] Defendant also argues that even if Plaintiff "quibbles" about the use of the word "alter", "the gist remains" that human involvement frequently changed the alerts' initial findings at the customers' request.[60]

The record reflects that ShotSpotter Senior Forensic Engineer Paul Greene testified on a number of occasions that ShotSpotter alerts or reports were altered.

In *Godinez*, Green testified:

> Forensic examination of an incident is always done at a customer's request, only at a customer's request. It's not something we do on a regular basis. In this case, ShotSpotter only detected the final two shots that you heard in the audio clip. An hour or so after the incident occurred, we were contacted by Chicago PD and asked to search for -- essentially, search for additional audio clips. And this does happen on a semiregular basis with all of our customers.[61]

In *Simmons*, Greene testified about data classifications in the following exchange:

---

[59] Def.'s Mot. at 18.
[60] *Id.*
[61] Def.'s Ex. 9 at 406:2-10.

Q. Mr. Greene, I want to stop you right there. This note here denotes some employee at [ShotSpotter] changed the classification per the instruction of the customer?

A. Per the customer's instruction, yes.

Q. Is that something that occurs in the regular course of business at [ShotSpotter]?

A. Yes, it is. It happens all the time.

Q. What happens if a customer calls and asks you to change a classification that has no link to the audio that you're listening to?

A. We have refused customers [sic] to change classifications on incidents in the past. Typically, you know, we trust our law enforcement customers to be really upfront and honest with us . . .[62]

The word "alter" means either "to make different without changing into something else" or "to become different." [63] It is apparent, from Greene's testimony, that there is a pattern of alterations, and that these alterations sometimes come by request of police departments.

This information, in addition to proper citation in the Article that Defendant conducted a "review of court documents from the *Williams* case and other trials in Chicago and New York State, including testimony from ShotSpotter's favored expert witness" provides a fair report privilege for Statement 1, 3, 4, and 5, pursuant to Section 47(d). The gist and sting of these court proceedings were accurately conveyed, through Greene's testimony.

---

[62] Pl.'s Amended Ex. 7.
[63] Merriam Webster Dictionary.

**ii. Jason Koebler Statements**

Plaintiff claims that the grouping of Statements 12, 13, and 14 – the Jason Koebler tweets – is defamatory. Plaintiff argues that there is no evidence that gunshots have been fabricated "from thin air" or that there is "blatant corruption." Plaintiff argues that these tweets create the gist that there is a conspiracy between ShotSpotter and police.

Defendant contends that these tweets are a form of opinion. Defendant argues that "a reader would understand the fiery nature of the Tweets as opinions based on information disclosed in the Article – not as assertions of fact."[64]

First, it is clear to the Court that certain words used by Mr. Koebler are opinion. In Statement 12, Koebler tweets, "This is horrifying and nuts." In Statement 14, Koebler tweets, "Blatant corruption." These words are not actionable. They are no worse than a plaintiff being accused of being "shockingly racist"[65] or accused of "blackmail."[66] "[A] published statement that is 'pointed, exaggerated, and heavily laden with emotional rhetoric and moral outrage' is not defamatory."[67]

Next, the Court considers whether the claims in Koebler's Statements that police are asking Shotspotter to "fabricate gunshots from thin air" and to "invent gunshots where they did not exist" are defamatory.

---

[64] Def.'s Mot. to Dismiss at 25.

[65] In 2021, the Delaware Superior Court dismissed a defamation claim based on a Plaintiff being called "shockingly racist." The Court struggled to reconcile how a jury could determine the truth or falsity of terms that had an "imprecise and debatable meaning. *Cousins v. Goodier*, 2021 WL 3355471 at *4, (Del. Super. July 30, 2021).

[66] *Greenbelt Co-op. Pub. Ass'n v. Bresler*, 398 U.S. 6, 14 (1970). The U.S. Supreme Court rejected the idea that the word "blackmail" in a news article could imply that the plaintiff had actually committed the crime of blackmail. "[E]ven the most careless reader must have perceived that the word was no more than a rhetorical hyperbole, a vigorous epithet."

[67] *Clifford v. Trump*, 339 F. Supp. 3d 915 (C.D. Cal. 2018), aff'd, 818 Fed. Appx. 746 (9th Cir. 2020) (TABLE).

Defendant argues that when the basis for an opinion is fully disclosed and made available to the reader through hyperlinks, the Court must find it to be nonactionable opinion based on disclosed fact. Here, Statement 12 links to the Article. Statement 13 links to a Paul Greene testimony excerpt in *Godinez*. Statement 14 links to an excerpt from the Article, about the phantom fifth shot in the *Simmons* case.

When analyzing Statements that are a mixture of fact and opinion, the Court must determine whether a reasonable factfinder "could conclude that the published statements imply a provably false factual assertion."[68] To answer that, the Court employs a "totality of circumstances" test to review the language in context and the Statements' susceptibility to being proven true or false.[69]

The parties cite different California case law to support their arguments. In 1999, a California district court, in reviewing a defendant's website which claimed that plaintiff was a murderer, fraud, and embezzler, held that opinions tied to underlying facts hyperlinked in articles were not actionable.[70] In 2004, a California court held the same because the e-mails in question, sent from the defendant to numerous companies he did business with, contained opinion based on "fully disclosed provably true facts."[71] Conversely, Plaintiff cites to a 2019 California court case, which held that a fair report privilege does not apply to hyperlinks that are used incorrectly.[72] The Court found that a hyperlink in an article could be interpreted by a reader to only apply to one of the allegedly defamatory statements and not the other one. The Court stated, "[Defendant's] placement of the hyperlink

---

[68] *Moyer v. Amador Valley Joint Union High Sch.*, 225 Cal.App.3d 720, 724-25 (1990).
[69] *Franklin v. Dynamic Details, Inc.*, 116 Cal.App.4th 375, 385 (2004).
[70] *Nicosia v. De Rooy*, 72 F. Supp. 2d 1093 (N.D. Cal. 1999)
[71] *Franklin v. Dynamic Details, Inc.*, 10 Cal. Rptr. 3d 429, 431 (Cal. App. 4th Dist. 2004).
[72] *Jezzini v. Adolf*, 2019 WL 4668008 at *8, (Cal. App. 2d Dist. Sept. 25, 2019).

and her use of surrounding language do not necessarily signal that the hyperlink is the source for the statement regarding the financial felonies."[73]

Koebler's tweets are dissimilar. There is no misplacement or mistake of hyperlink. There is no chance that a trier of fact could understand a link to apply to one Statement and not another. Koebler links to the entire Article in the first tweet, and links to specific screenshots of the Article and relevant testimony in the next two. It would be clear to a reader that these three tweets should be read in conjunction with the Article, the Greene testimony, and the excerpt about the *Simmons* case.

A reader could view the embedded links and determine whether to "accept or reject" Koebler's interpretation of the facts, "based on his or her own independent evaluation."[74] For that reason, Koebler's tweets are protected opinion.

### iii. Statements about court cases

The Court finds that the remainder of the proffered Statements are not defamatory. This includes the Statements about the *Williams* case and prosecutors withdrawing evidence (Statements 2, 7, 11, 15), the *Simmons* case (6 & 10), and untested evidence (7, 8, 9).

There is substantial truth in the *Williams* and *Simmons* Statements. As demonstrated in the Complaint, the prosecutors' case and ensuing ShotSpotter evidence was withdrawn in *Williams*.[75] While the Statement oversimplifies the sequence of events, it is admitted in the Complaint that prosecutors learned of the limitations of ShotSpotter technology, then "dropped the case."[76] Also, the location was in fact changed for the gunshots. The Complaint acknowledges that the

---

[73] *Id.*
[74] *Franklin v. Dynamic Details, Inc.*, 10 Cal. Rptr. 3d 429, 431 (Cal. App. 4th Dist. 2004).
[75] Compl. ¶ 48.
[76] *Id.*

21

location change was due to ShotSpotter providing police with the geolocation of the park entrance, rather than the specific gunshot location.[77] Further, these Statements are supported by and derived from a motion filed by William's public defender. The Article specifically states: "That night, 19 ShotSpotter sensors detected a percussive sound at 11:46 p.m. and determined the location to be 5700 South Lake Shore Drive—a mile away from the site where prosecutors say Williams committed the murder, *according to a motion filed by Williams' public defender*."

In *Simmons*, the Article states that a fifth shot disappeared. It bases this Statement on a New York court decision which overturned the defendant's conviction; the judge called it "troubling" that ShotSpotter evidence had disappeared.[78] The full context provides that this happened after the evidence was already heard by a jury, then was later deleted per company protocol.

While these Statements may lack the sufficient journalistic context, they are substantially true in their conveyance. A plaintiff cannot defeat the California privilege by drawing "fine distinctions" between the report and underlying records.[79]

As to the withdrawn evidence, it is substantially true that the evidence had been untested in Illinois courts. Further, the Article provides proper context for this by also stating that ShotSpotter evidence and employee testimony has been admitted in 190 court cases. Statements 7 and 9 also contain a portion of opinion, because surmising that ShotSpotter may face "huge" or "massive ramifications" in

---

[77] Compl. ¶ 47.
[78] *People v. Simmons*, 71 N.Y.S.3d 924 (N.Y. Sup. Ct. Monroe Cty., Feb. 13, 2018) ("Greene testified that the recording before and after the incident in question had been deleted, as per procedures. This alone is troubling.")
[79] *Cotl v. Freedom Comm'n,* 109 Cal. App. 4th 1551, 1558-59 (2003).

22

Chicago is based on facts in the Article underlying this hypothesis. This constitutes non-actionable opinion commentary.

Accordingly, considering each of the Statements coupled with the documents to which they refer, the Court finds that they are protected expressions of opinion, substantially true, and/or nondefamatory.

### E. There is insufficient evidence of malice.

Even if Plaintiff were to establish the defamatory nature of the Statements at the pleading stage, it fails to set forth sufficient evidence of malice. Defendant argues that Plaintiff, as a public figure, cannot establish with convincing clarity that Defendant acted with actual malice. A public figure may not recover damages for defamation unless it proves that the statement was made with actual malice.[80] This means that the Defendant "knew [each] statement was false or acted with reckless disregard for the truth."[81] Further, Plaintiff must prove that the state of mind required for actual malice would have to be "brought home" to the persons in the media organization having responsibility for the publication.[82] Thus, Plaintiff must prove that not just the author and editor of the Article, but also Koebler and the podcast speakers were acting with malice. Defendant also claims that the Complaint fails to support actual malice as to each of the individual statements.

Plaintiff contends that the totality of circumstances may prove Defendant's malice.[83] A plaintiff may prove the defendant's state of mind through

---

[80] *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964). Here, Plaintiff makes no argument that ShotSpotter is not a public figure. Indeed, the Complaint even makes references to ShotSpotter in other news stories, heralding it as a life saver for the community.

[81] *Id.*

[82] *Id.* at 287. *See also, Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123 (2d Cir. 2013) ("When there are multiple actors involved in an organizational defendant's publication of a defamatory statement, the plaintiff must identify the individual responsible for publication of a statement, and it is that individual the plaintiff must prove acted with actual malice.")

[83] *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657 (1989).

circumstantial evidence.[84] Here, it is alleged that Defendant (1) published Statements that contradict information known to VICE, (2) omitted and cherry-picked material facts, (3) conceived the story line in advance of its actual reporting, based on its guide of how to pitch stories, (4) acted due to financial motive, and (5) refused to retract the story. Plaintiff asserts that these prongs are the "building blocks" to make a claim for malice, and that it is "brought home" to everyone within VICE because every participant, including reporter Todd Feathers, Koebler, and the podcast participants, had access to the court records, and each chose to misrepresent them.

In order to find the type of malice that Plaintiff alleges, there must be "sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of [the] publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice."[85] The Defendant must have had a "high degree of awareness" of probable falsity.[86]

The parties dispute whether a misrepresentation of court records can amount to malice. Plaintiff cites to a 1985 California District Court case, in which a defendant author's misrepresentation of the plaintiff's arrest report was sufficient evidence of malice in a defamation case.[87] In two promotional appearances on local television stations for the defendant's new book, he accused the plaintiff of having been convicted of drunk driving. In reality, plaintiff had been charged for being drunk in public and resisting arrest.

The Court viewed the defendant's statements as permitting a jury to find by clear and convincing evidence that actual malice existed because he had admitted

[84] *Id.* at 668.

[85] *Antonovich v. Super. Ct.*, 285 Cal. Rptr. 863, 866 (Cal. App. 2d Dist. 1991). *See also*, *US Dominion, Inc. v. Fox News Network, LLC*, 2021 WL 5984265 (Del. Super. Dec. 16, 2021).

[86] *Id.*

[87] *Murray v. Bailey*, 613 F. Supp. 1276 (N.D. Cal. 1985).

to seeing an arrest report that explicitly stated that the charges were not as he characterized them. The Court distinguished this case from others because the alleged defamer "had actually seen 'hard evidence' that rebutted his allegations." The Court held that it would be "unjust and nonsensical to allow the defendant to rely on the [arrest] report for certain purposes and to ignore it for others."[88]

Here, the Court finds no such "hard evidence" acknowledged by Defendant that rebuts the Statements made. To review an arrest report which clearly identifies the crimes committed, and to yet report different crimes committed, is akin to reporting $2 + 2 = 5$. That is a false reporting of an objective fact. The court records scrutinized in the Article, here, are more analogous to the number of cases cited by Defendant, which held that inaccuracies in reporting judicial proceedings do not constitute actual malice.[89] Sloppy reporting does not establish recklessness.[90] Inaccuracy itself will not demonstrate actual malice in a libel case; "even a dozen errors" in the Article due to mistakes or bad judgment do not substitute for knowing falsehood or reckless disregard as to falsity.[91] The Court does not find such a disregard for the truth in the publishing, and thus, ascribes little merit to Plaintiff's allegations of intentional misrepresentation.

Plaintiff specifically takes issue with Defendant's allegations that evidence of a "phantom" fifth shot disappeared in *State v. Simmons*, that ShotSpotter changed coordinates in *Williams* from where the gunshot was originally pinned, and that testimony in *Godinez* showed that police asked ShotSpotter to "invent" gunshots where they don't exist. The Court already found that these Statements

---

[88] *Id.*
[89] *Weingarten v. Block*, 102 Cal.App.3d 129, 147 (1980) (citing *Time, Inc. v. Pape*, 401 U.S. 279 (1971)). *See also, Reliance Ins. Co. v. Barron's*, 442 F.Supp. 1341, 1350 (S.D.N.Y. 1977).
[90] *Weingarten v. Block*, 102 Cal.App.3d 129, 147 (1980).
[91] *Reliance Ins. Co. v. Barron's*, 442 F. Supp. 1341 (S.D.N.Y. 1977)

were not defamatory, and thus, Defendant could not have published them with a reckless disregard for the truth, for the same reasons previously stated.

In addition, Plaintiff alleges that Defendant omitted key facts, such as: (i) ShotSpotter evidence has "repeatedly withstood" *Frye* and *Daubert* scrutiny, (ii) that ShotSpotter experts have helped defend constitutional rights, and (iii) that ShotSpotter is led by a black CEO.[92] Notably, the Article states that this ShotSpotter evidence has been admitted in 190 cases, acknowledging the information that ShotSpotter provided before publication. Notwithstanding, the Court finds these facts irrelevant. Defendant is under no obligation to publish flattering facts about its subject matter. Omitting these facts does not contradict Statements made in the Article and, without more, does not show a reckless disregard for the truth.

The Court finds the rest of Plaintiff's arguments for malice equally unavailing. This includes that Defendant's investigation was a "farce" based on how it has previously tailored stories, that financial motives support malice, and that a refusal to retract also shows malice.[93] Considering Defendant's arguments collectively would indicate that the vast majority of news articles published every day – by outlets with preconceived narratives, financial motives, and an inclination to not retract published stories -- would be subject to accusations of malice. As the U.S. Supreme Court has previously held, "[i]f a profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty

---

[92] The Court notes that the Statements in question do not involve race. There are a couple paragraphs in the Article that mention ShotSpotter sensors being placed "almost exclusively in predominantly Black and brown communities[.]" However, Plaintiff does not challenge these sentences as defamatory.

[93] Defendant asserts that the only pre-publication communication between the parties was when Vice reached out for a comment and ShotSpotter said their products have been used in 190 places, and that any repudiation of fact from ShotSpotter came post-publication.

vessels."[94] Further, a publisher is not required to provide an objective picture.[95] There is a First Amendment protection for writing "which seeks to expose wrongdoing and arouse righteous anger" even if it lacks objectivity.[96]

The Court finds that even viewing the facts in the light most favorable to the Plaintiff, even if the Statements were found to be defamatory, there is insufficient evidence, here, of malice or reckless disregard for the truth to defeat a Motion to Dismiss.

### F. Defamation by Implication

Plaintiff alleges that Defendant "falsely implied and suggested to readers and listeners that ShotSpotter conspires with police to fabricate and alter evidence to frame Black men for crimes they did not commit."[97] Plaintiff claims that a number of statements would lead a reasonable person to believe that Plaintiff engaged in "evidence tampering, evidence falsification, and other misconduct in connection with the provision of expert analysis and testimony."[98] Plaintiff alleges that each of these implications were published with actual malice.

The standard for malice is heightened in a defamation by implication claim. The Third Circuit has held that while ordinary defamation cases require knowledge of falsity, "showing known falsity alone is inadequate to establish an intent" in defamation by implication cases.[99] The Court held that plaintiffs must "show something that establishes defendants' intent to communicate the defamatory meaning."[100] Alternatively, reckless disregard for the defamatory meaning of a statement can satisfy the standard.

---

[94] *Harte-Hanks Commun., Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).
[95] *Reader's Dig. Assn. v. Super. Ct.*, 690 P.2d 610, 619-20 (Cal. 1984).
[96] *Id.*
[97] Compl. at 36.
[98] *Id.* at 37.
[99] *Kendall v. Daily News Pub. Co.*, 716 F.3d 82, 90 (3d Cir. 2013).
[100] *Id.*

Plaintiff contends that Defendant knew of the defamatory inference of the Article because Defendant misrepresented facts from court records. The Court has already found that Plaintiff could not satisfy the lesser standard of reckless disregard for the truth, and hence it cannot satisfy the greater standard of intent to communicate defamatory meaning. The Motion to Dismiss for Defamation by Implication is granted for the above stated reasons.

## VI. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion to Dismiss.

IT IS SO ORDERED, this 30th day of June, 2022.

_____
Judge Sheldon K. Rennie